**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00630 (CJN)** |
| **v.** | : | |
| | : | |
| **CLIFFORD JAMES METEER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Clifford James Meteer to seventy-five days imprisonment, followed by three years' probation, 60 hours of community service, and $500 restitution.

**I.      Introduction**

The defendant, Clifford Meteer ("Meteer"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Meteer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of seventy-five days' imprisonment followed by 3 years' of probation is appropriate in this case because Meteer: (1) breached the Capitol after he followed a mob of rioters that overran the police at the Upper West Terrace Staircase and Meteer celebrated this action; (2) remained in  the Capitol for approximately

31 minutes and made his way to numerous locations there, including the Crypt, Statuary Hall, and just outside the House Chamber, and only left after law enforcement forced him out; (3) made statements on Facebook and in three television interviews after January 6 that reveal a total lack of remorse; (4) in a television interview that Meteer had on the one-year anniversary of the riot, and while on supervision in this case, Meteer again expressed no remorse about his actions and made incendiary remarks in the interview; (5) falsely downplayed the violence on January 6 declaring that there was no riot, and that the news coverage was overblown; (6) refused, when questioned by the FBI, to admit that he went into the Capitol; (7) has a felony conviction for tampering with evidence and misdemeanor conviction for criminal possession of a weapon in his recent background, from which he was discharged from probation in 2018; and (8) allegedly possessed 10 firearms and several rounds of ammunition in his home, even though he was prohibited from doing so because of his prior felony conviction. See 18 U.S.C. § 922(g)(1).

The Court must also consider that Meteer's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Statement of Judge Chutkan). Here, Meteer's participation in a riot that succeeded in halting the Congressional certification combined with Meteer's spreading of false information, downplaying the violence at the Capitol, and his lack of remorse as shown in news interviews, renders a significant prison sentence followed by probation both necessary and appropriate in this case.

## II.  Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Meteer's conduct and behavior on January 6.

*Meteer's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Meteer drove with others from his home in Knoxville, Tennessee to Washington, D.C., to protest the 2020 presidential election. *See* ECF 25 at ¶ 9. On January 6, 2021, Meeter walked to the Capitol and entered Capitol grounds with a two-sided sign with the wording "SAVE THE REPUBLIC" on one side and "STOP THE STEAL" on the other side. Upon his arrival, Meteer observed barriers on Capitol grounds, but he continued to advance to the Capitol building.  *See* ECF 25 at ¶ 10.

Meteer is first seen on Capitol building cameras outside the West Front at 2:12  p.m. Eastern Standard Time (EST) as seen in the images below, where he undoubetly saw chaos and disorder as rioters formed to breach a police line in that area.. (The time stamp seen in the screenshots of Capitol Building cameras is in Coordinated Universal Time, making it five hours ahead of EST.)

3



**Image 1**



**Image 2**

Meteer then continued towards the Upper West Terrace.  Approximately 9 minutes after a police line was broken by rioters in this area,  Meteer ascended the Upper West Terrace staircase by climbing the stone handrailing. There, he triumpantly displayed his sign, celebrating, as he and his fellow rioters took over and fully occupied this area.



**Image 3**



**Image 4**

Meeteer then continued up the stairs. He entered the Capitol building through the Senate Wing doors at approximately 12:24 p.m. EST, approximately 11 minutes after the window immediately adjacent to the door was smashed out by another rioter using a riot shield. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass.



**Image 5**



**Image 6**

Meteer continued through the Capitol building walking through the Crypt, and then through Statuary Hall, as seen in the images below.



**Image 7**



**Image 8**

Meteer continued through the Capitol building for several more minutes eventually nearing the House Chamber.



**Image 9**

In the screenshot below, Meteer can be seen after U.S. Capitol Police had to instuct him to leave and forcibley push him, and other rioters, from the Upper House Door Interior hallway. Meteer did not resist the police's direction. He did, however, photograph himself being forced out of the Capitol.



**Image 10**

Meteer exited the Capitol building through the East Front House Door at 2:55 p.m. as seen in the image below, approximately 31 minutes after he entered it.



**Image 11**

*Social Media Posts*

On January 5, 2021, Meteer posted on Facebook that "I'll be in DC on the 6th protecting the stolen election. . ."

On January 7, 2021, Meteer sent a private message to a friend through Facebook stating, "I was in the capital ;)". In a string of comments publically posted on Facebook on January 7, 2021, Meteer stated, *inter alia*,:

> a.   "I was there. No riot. Trump Lives Matter. I was right where our honored veteran was viciously assassinated. Dems protest by looting Walmart; reps protest by "petitioning" congress. And their answer is a modern day Boston massacre.",
>
> b.  "Murder case n the capital building. Trump lives matter", "I was there","Are you nuts!!!!!? The democrat stealing the election is the cause of loyal citizens storming the Bastille", "That's Our house. They don't get to disregard our vote", "I saw no violence. I saw no destruction. Are you surprised he [sic] media is distorting reality? I saw 2 kids trying to kick in a door and we told them to stop and they did. As to violence, I was right around the corner from the vet who was murdered."

While on Facebook on January 8, 2021, Meteer discussed with a friend his time in the Capitol. He admitted, "I was one of those idiots scaling the wall ;)" Meteer also sent a message with photos of   police officers who had to forced him out of the Capitol along with three other images of rioters occupying the Capitol.





**Image 12**

Meteer stated that he "was near where the vet was shot."  Meteer's friend responded that, "you are

so lucky that you are White. Lol" Meteer later stated, "we weren't making trouble" and that "the

"news coverage is Extremely overblown. I was there." Meteer also stated,"[f]rom my position, the

insurrection was trying to frame Pres Trump with the collusion delusion. Or the impeachment that

accused him of what Biden did. That's My House. I saw no violence, no vandalism, no mayhem.

But, from my point of view, as I have no doubt that skullduggery was done at the polls, the legitimacy of congress has been revoked. Liberalism ascertains that those who governs, governs at the will of the people. Once the sacred vote is violated, a patriots duty is to rattle the cage, to remind them who Really runs the show. And as long no great desecration occurs, honor was preserved."

In another public statement posted on Facebook on January 14, 2021, Meteer compared his conduct and that of his fellow rioters at the Capitol to that of a Patriot. He stated: "[o]n November 3rd, democrats stole the presidential election. On January 5th, democrats stole 2'senate seats. On January 6th, patriots reminded them they will not get away scot [sic] free."

On January 29, 2021, Meteer downplayed the riot at the Capitol, stating on Facebook, "[w]hat riot? No burning no looting, just a handful of People (agitators) dancing with the cops. No. To equate DC with a riot is to lose All perspective."  To a much broader television audience, ostensibly on the one-year anniversary of the riot at the Capitol, and well after he was arrested in this case and placed on pretrial supervision, Meteer interviewed with a Tennessee news station on January 6, 2022. Meteer again maintained that he had no regrets about his participation in the riot on January 6th, stating, "I hate being drug through this but what's the alternative? If our vote isn't taken seriously, we don't have a republic. If powers can manipulate the power of elections we don't have a republic."  Meteer also stated that, "[t]hey wanted to make us the villains . . .  [w]e're the Jews in Nazi Germany."  *See* https://www.wvlt.tv/2022/01/06/knoxville-capitol-rioter-reflects-past-year/

*Meteer's Arrest and FBI Interview*

FBI agents executed a federal search warrant at Meteer's residence on August 10, 2021, where he resides with his girlfriend. There, they found and seized numerous firearms and ammunition which were located in various places in Meteer's home, including on nightstands in two separate rooms, in another room of the house leaning against a wall, in a gun box, in a cabinet, in bags, and on the floor of that room. One firearm, a Ruger 380, and ammunition were found in cargo shorts pockets. In total, the FBI found the following firearms and ammunition in Meteer's residence:

1) a Hi-Point Firearms semi-automatic handgun, Model: JHP, 45 caliber, S/N: 4332291, with a  magazine and ammunition;

2) a Ruger Bull Barrel handgun, .22 caliber long rifle, Model Mark II Target, with a magazine and ammunition;

3)  a Weatherby 300 Magnum Bolt Action Rifle, Model: Mark V, S/N: P9706 with a Bausch and Lomb scope, a magazine and ammunition;

4) a Kimber Ultra Carry II semiautomatic handgun, S/N: KU109172, 45 caliber with 6 magazines and ammunition;

5) a Springfield Armory rifle, 30 caliber, S/N: 1510512, with a magazine and ammunition;

6) a Winchester shotgun, 12-gauge, Model: 101, S/N: 109474, with ammunition.

7)  a Marlin 22 long rifle, Model: 25N, S/N: 06427261 with a RedHead Pursuit Airgun scope, two magazines and ammunition.

8) a single shot shotgun, Cannon Breach, S/N: 48974 and 13 rounds of 12 gauge shot gun shells;

9) a Ruger .380 semi-automatic handgun, Model: LCP, S/N: 373-04145, with a magazine and ammunition;

10) a Ruger Black Hawk .357 revolver, S/N: 111860, with ammunition;

*See* ECF 25 at ¶ 17.

In the January 6, 2022 interview referenced above, Meteer readily admitted that the firearms were his. When asked about what his past year has been like, Meteer stated, "[a]side from having the FBI coming in and stealing all my weapons, put in jail for a day, and under a cloud of federal scrutiny, everything's fine. Keep on keeping on." Meteer was convicted in 2013 for felony tampering with evidence. *See* ECF 28 at ¶ 34.  Being a convicted felon, Meteer is prohibited from possessing any firearms or ammunition. See 18 U.S.C. § 922(g)(1). Meteer voluntarily agreed to an interview with the FBI at the time of his arrest. During the interview, Meteer admitted that he went to Washington, D.C., on January 6, 2021 to protest the 2020 election, an election he claimed was stolen.  Meteer refused to answer questions about whether he entered the Capitol building. See ECF 25 at ¶ 16.

*The Charges and Plea Agreement*

On August 4, 2021, Meteer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On August 10, 2021, he was arrested at his home in Tennessee. On October 15, 2021, Meteer was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 13, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C.

§ 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Meteer agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Meteer now faces a sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Meteer faces up to six months of imprisonment, not more than five years' probation, and a fine of up to $5,000. Meteer must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, this Court should assess Meteer's individual conduct in light of a number of critical factors, to include: (1) whether, when, how he entered the Capitol building; (2) whether he encouraged violence; (3) whether he encouraged property destruction; (4) his reaction to acts of violence or destruction; (5) whether during or after the riot, he destroyed evidence; (6) the length of his time inside of the building, and exactly where he traveled; (7) his statements in person or on social media; (8) whether he cooperated with, or ignored commands from law enforcement officials; and (9) whether he demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Meteer personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Meteer's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

When Meteer arrived at the Capitol, he saw barricades that were placed to keep rioters from entering Capitol grounds. ECF 25 at 10.  Nonetheless, he proceeded past those barricades to the

Upper Terrace West stairs, where he and other rioters crowded the stairs. Rioters forcibly overran the police line there, conduct which Meteer capitalized on when he followed the mob into the Capitol Building. Before doing so, Meteer got on the cement rails of the stairs and held up his two-sided sign, reveling in his actions and those of his fellow rioters.

Meteer entered through the Senate Wing doors, a place where he undoubtedly observed the broken glass of the Senate Wing windows.  Meeter advanced through different parts of the Capitol, including the Crypt and Statuary Hall. He eventually made it all the way to the outside of the House Chamber where members of Congress had just been engaged in the certification of 2020 Electoral College vote.  Altogether, Meteer spent approximately 31 minutes in the Capitol. He entered at 2:24 p.m. and exited through the East Front House Door at approximately 2:55 p.m.  By illegally occupying the Capitol, Meteer accomplished his goal of going to "DC on the 6th [and] protecting the stolen election. . ." and engaging in what he deemed as " a patriots duty [which]  is to rattle the cage, to remind them who Really runs the show."

Meteer's actions and statements since January 6 show that he obviously does not regret his conduct. On August 10, 2021, following his arrest in this case, Meteer interviewed with WBIR News.



**Image 13**

Meteer told a news interviewer, "I am not ashamed. I am proud of it. When the sacred vote is stolen, you know, so brashly, it is up to us to say no this is our country?" When asked what he would say to the members of Congress who were terrified because of the riot on January 6, Meteer responded that the violence was justified, "[p]erhaps there was a reason to be scared. Perhaps the guilt of stealing the election."   https://www.wbir.com/article/news/local/feds-knoxville-man-illegally-entered-us-capitol-during-jan-6-riot-carrying-stop-the-steal-sign/51-dd6de1e7-b014-4348-a1e1-89dc6e3c31e8.

In another interview on August 10, 2021, Meteer downplayed the violence at that Capitol. This time he interviewed with WATE News in Knoxville.



**Image 14**

Meteer said that, "[e]verybody was peaceful." He also claimed, "[f]irst of all the doors were open. The Capitol Police were standing right there and letting people in." https://www.wate.com/news/knoxville-man-facing-charges-from-capitol-riot-calls-jan-6-events-peaceful/.  Meteer, however, knows that is not true. No Capitol Police officer ushered him into the Capitol as shown below.



**Image 15**

Meteer has had three television interviews since he was arrested in this case, two in August 2021 and one on the one-year anniversary of the riot. He also has made numerous comments in social media. His public comments on the riot show a total lack of remorse. In fact, regarding his participation in the riot, Meteer has asserted "I am not ashamed. I am proud of it." Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration followed by probation.

### B. Meteer's History and Characteristics

Meteer's criminal history consists of a 2013 felony conviction for Tampering with Physical Evidence and a misdemeanor conviction for Criminal Possession of a Weapon. The basis of these convictions stem from Meter making threats to harm himself while in possession of firearm. Believing that that firearm was going to be used as evidence in his prosecution, Meteer hid or concealed it. Meteer was sentenced to 5 years' probation for the felony evidence tampering conviction and 3 years' probation for the misdemeanor weapon possession conviction. He

completed his term of probation on February 7, 2018. *See* ECF 28 at  ¶¶ 34, 52.  Meteer also has several traffic-related convictions. *See* ECF 28 at ¶¶ 33, 36.

As a convicted felon, Meteer is prohibited from possessing firearms or ammunition. When FBI agents searched Meteer's residence on August 10, 2021, pursuant to a federal search warrant in this case, they found ten firearms and hundreds of rounds of ammunition.  Meteer, a convicted felon, lived in a residence with 10 firearms, including rifles and shotguns, along with hundreds of rounds of ammunition when he engaged in his unlawful conduct at the U.S. Capitol. These facts alone weigh strongly in favor of incarceration and a more serious sentence than the prior term of probation that Meteer completed in 2018. Moreover, a sentence of incarceration followed by a term of probation is warranted to ensure Meteer's compliance with the law. That is especially true since he has not expressed remorse for his actions, and, if given the chance, could repeat them.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (Statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (Statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Meteer's words, post-arrest interviews, and statements on social media clearly demonstrate the need for specific deterrence for this defendant. Meteer has claimed that the "news coverage [of the violence at the Capitol] is Extremely[sic] overblown." He has shown no remorse for his participation in the riots and the violence that ensued. To the contrary, when asked about his actions at the Capitol, Meteer defiantly told a news reporter on August 10, 2021 that "I am not ashamed. I am proud of it. When the sacred vote is stolen, you know, so brashly, it is up to us to say no this is our country?" He, apparently believes that the violence that occurred at the Capitol was justified commenting that members of Congress "[had] a reason to be scared. Perhaps the guilt of stealing the election." https://www.wbir.com/article/news/local/feds-knoxville-man-illegally-entered-us-capitol-during-jan-6-riot-carrying-stop-the-steal-sign/51-dd6de1e7-b014-4348-a1e1-89dc6e3c31e8. Even a year after the riot, and having time to reflect upon his actions, Meteer still showed no remorse in an interview that he gave on January 6, 2022 where he stated:

"I hate being drug through this but what's the alternative? If our vote isn't taken seriously, we don't have a republic. If powers can manipulate the power of elections we don't have a republic." . . . ."[t]hey wanted to make us the villains . . .  [w]e're the Jews in Nazi Germany."  *See* https://www.wvlt.tv/2022/01/06/knoxville-capitol-rioter-reflects-past-year/

Meteer's failure to acknowledge the dangers and violence of January 6, 2021, his repeated spreading of false information relating to the attack on the Capitol, his lack of remorse, and participating in storming the Capitol only three years after completing probation in another case underscore the need for specific deterrence here.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[3] *See United States v. Anna Morgan-Lloyd*,

---

[2]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in

1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (Statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (Statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Meteer has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed on *United States v. Karl Dresch*, 1:21-CR-0071 ABJ, *United States v. Robert Bauer and Edward Hemenway*,

1:21-CR-00049 TSC, *United States v. Frank J. Scavo*, 1:21-CR-254 (RCL), and *United States v. Boyd Camper*, 1:21-cr-00325 (CKK) where the defendants either had  serious criminal records, spread falsities about the riot through social media or news interviews, or showed no remorse for their actions.

In the *Bauer and Hemenway* case, two cousins entered the Capitol together even though they saw a "Do Not Enter Sign", and officers in S.W.A.T. gear outside of the building, clearly indicating that they should not enter the Capitol. (*See* 1:21-CR-00049 TSC, Dkt. 26, at 8 (Hemenway Statement of Offense)). While inside the U.S. Capitol, Bauer and Hemenway chanted, "Stop the Steal!" Bauer also took pictures and videos in the Capitol, and chanted, "Our house! Our house!" *Id*. at 9.  Hemenway has a serious criminal history, with a conviction for Sexual Battery and Criminal Confinement.  (*See* 1:21-CR-00049 TSC, Dkt. 32, at 11 (Government's Sentencing Memorandum regarding Hemenway).  Bauer has convictions for Operating a Motor Vehicle Alcohol-Drugs, Possession of Anhydrous Ammonia and Vandalism, Possession of Methamphetamine, Manufacturing Methamphetamine and related charges, and Unlawful Possession of Meth Precursor. (*See* 1:21-CR-00049 TSC, Dkt. 33, at 11 (Government's Sentencing Memorandum regarding Bauer)). The Government recommended a 30-day sentence of imprisonment for both defendants. Instead, Judge Chutkan sentenced them to 45 days imprisonment, 60 days of community service, and $500 restitution.

In the *Dresch* case, the defendant had convictions for fleeing and eluding arrest, disturbing the peace, permitting another to violate the motor vehicle code, and obstructing an officer. The Court detained defendant following his arrest on charges for his illegal conduct in the Capitol on January 6.  Dresch entered the Capitol knowing that law enforcement officials were trying to repel rioters by using tear gas.  In response to a Facebook message that warned, "Word is police are

28

getting ready to use tear gas," Dresch responded, "Been using it. Mask up." (*See* 1:21-CR-0071 ABJ, Dkt. 33 (Government's Sentencing Memorandum), at 7). Dresch also expressed satisfaction and enthusiasm regarding the events at the Capitol. On the night of January 6, Dresch commented on a picture of a crowd at the Washington Monument, and posted, "Total Victory!" and, "I'm excited!" (*See* 1:21-CR-0071 ABJ, Dkt. 33, at 7-8). Judge Berman Jackson sentenced Dresch to 6 months' incarceration.

In another matter, the defendant, Frank Scavo, entered the Capitol through the Rotunda Doors, where multiple assaults on law enforcement officers occurred, some of which Scavo captured on his cellphone. Despite witnessing violence, Scavo, entered the Capitol. Unlike Meteer, Scavo was in the Capitol for a relatively short period of time, approximately 10 minutes.  But like Meteer, Scavo was boastful about his participation. Scavo also downplayed the violence at the Capitol, and made public statements, including in a television interview, that downplayed and made light of his conduct.  Scavo, was cooperative with his investigation and produced to the FBI evidence of his conduct at the Capitol. He also expressed remorse for his actions. Scavo also had no prior convictions at the time of sentencing. Nevertheless, Judge Lamberth Court sentenced him to 60 days' incarceration. *United States v. Frank J. Scavo*, 1:21-CR-254 (RCL)

Finally, in *United States v. Boyd Camper*, 1:21-cr-00325 (CKK), the defendant entered the U.S. Capitol despite seeing violence between rioters and officers, concealed video and audio evidence collected by his Go-Pro camera that he brought inside the Capitol, made statements to the media indicating a complete lack of remorse and suggesting the possibility of future violence ("We're going to take this damn place."). Judge Kollar-Kotelly  sentenced Camper to two months' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984),

*codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[4] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[5] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

---

[4] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[5] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result"

could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted

of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").   Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).   Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.   And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with

icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In

other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Meteer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation, a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[6]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862,

at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

and reversing magistrate's sentence that included 30-day period of confinement as a condition of

probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18,

2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation

---

[6] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not
intended to carry forward the split sentence provided in Section 3561, by which the judge imposes
a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404,
at *98.

was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[7]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes intermittent imprisonment as a term of probation in Meteer's case given the requested 75-day imprisonment sentence.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Clifford

---

[7] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Meteer seventy-five days' imprisonment, 60 hours of community service, three years' probation, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: /s/ Anthony L. Franks
ANTHONY L. FRANKS
Missouri Bar No. 50217MO
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
for the District of Columbia
Telephone No. (314) 539-3995
anthony.franks@usdoj.gov